## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x

*In re*                                                    :

                                                           :        Chapter 11 Case No.

**CAPMARK FINANCIAL GROUP INC.**, *et al.*,                :        09-13684 (CSS)

                                    Debtors.               :        **Jointly Administered**

------------------------------------------------------------x

**ADVERSARY PROCEEDING**                          x

                                                           :

**CAPMARK FINANCIAL GROUP INC.;**                          :
**CAPMARK CAPITAL INC.; CAPMARK**                          :
**FINANCE INC.; COMMERCIAL EQUITY**                        :
**INVESTMENTS, INC.; MORTGAGE**                            :        **Adversary Proceeding No. ____**
**INVESTMENTS, LLC; NET LEASE**                            :
**ACQUISITION LLC; SJM CAP, LLC,**                         :

                                                           :

                        **Plaintiffs,**                    :

                                                           :

                - against -                                :

                                                           :

**GRUSS GLOBAL INVESTORS MASTER**                          :
**FUND, LTD.; GRUSS GLOBAL INVESTORS**                     :
**MASTER FUND (ENHANCED), LTD.;**                          :
**PERRY PARTNERS INTERNATIONAL,**                          :
**INC.; PERRY PARTNERS L.P.; TPG**                         :        **COMPLAINT FOR**
**CREDIT OPPORTUNITIES FUND, L.P.; TPG**                   :        **DECLARATORY AND**
**CREDIT OPPORTUNITIES INVESTORS,**                        :        **INJUNCTIVE RELIEF TO**
**L.P.; TPG CREDIT STRATEGIES FUND,**                      :        **CONFIRM APPLICABILITY**
**L.P.; THE VARDE FUND, L.P.; THE VARDE**                  :        **OF AUTOMATIC STAY OR**
**FUND V-B, L.P.; THE VARDE FUND VI-A,**                   :        **ALTERNATIVELY TO**
**L.P.; THE VARDE FUND VII-B, L.P.; THE**                  :        **IMPOSE SECTION 105 STAY**
**VARDE FUND VIII, L.P.; THE VARDE FUND**                  :
**IX, L.P.; THE VARDE FUND IX-A, L.P.;**                   :
**VARDE INVESTMENT PARTNERS**                              :
**(OFFSHORE), LTD.; VARDE INVESTMENT**                     :
**PARTNERS, L.P.; VR LIQUIDITY CRISIS**                    :
**RECOVERY FUND, L.P.; VR GLOBAL**                         :
**PARTNERS; YORK CAPITAL**                                 :
**MANAGEMENT, L.P.; YORK INVESTMENT**                      :
**MASTER FUND, L.P.; YORK SELECT, L.P.;**                  :
**YORK CREDIT OPPORTUNITIES FUND,**                        :
**L.P.; HFR ED SELECT FUND IV MASTER**                     :

**TRUST; LYXOR/YORK FUND LIMITED;** :
**YORK SELECT MASTER FUND, L.P.;** :
**YORK GLOBAL VALUE MASTER FUND,** :
**L.P.; PERMAL YORK LIMITED; YORK** :
**CREDIT OPPORTUNITIES MASTER FUND,** :
**L.P.; AMERICAN DURHAM LP;** :
**INTERNATIONAL DURHAM LTD.;** :
**AURELIUS CAPITAL MASTER LTD.; ACP** :
**MASTER, LTD.; AND THIRD POINT, LLC,** :
                                                                        x
                    **Defendants.**

-------------------------------------------------------------------

Plaintiff-debtors Capmark Financial Group Inc.; Capmark Capital Inc.; Capmark Finance Inc.; Commercial Equity Investments, Inc.; Mortgage Investments, LLC; Net Lease Acquisition LLC; and SJM Cap, LLC (collectively, "Plaintiff-Debtors" or "Debtors"), by their undersigned attorneys, allege upon knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.     On or about May 10, 2007, Capmark Financial Group Inc. ("Capmark" or the "Issuer") issued $2,550,000,000 of unsecured notes, consisting of (i) $850 million of Floating Rate Senior Notes Due 2010; [1] (ii) $1.2 billion of 5.875% Senior Notes Due 2012; and (iii) $500 million of 6.300% Senior Notes Due 2017 (collectively, the "Notes"). Each of the Notes was issued pursuant to a separate indenture (each, an "Indenture" and collectively, the "Indentures") between Capmark, the guarantors named therein (the "Guarantors"), and Deutsche Bank Trust Company Americas ("DBTCA"), as Indenture Trustee.

---

[1]     The amount of Floating Rate Senior Notes issued and outstanding was reduced to $830 million following an exchange offer that expired on April 24, 2008.

2.     In May 2009, in connection with the issuance of $1.5 billion in secured debt under a Term Facility Credit and Guaranty Agreement (the "Term Loan Facility"), Capmark presented DBTCA with, and requested that it execute, three supplemental indentures (the "Supplemental Indentures") for the purpose of amending Section 4.04 of each Indenture (the "limitation on liens" covenant) to cure an ambiguity, omission, defect or inconsistency therein created by the inadvertent omission of the words "secured by Liens" in one of the exceptions to the negative covenant relating to the granting of liens on assets. Each amendment was made to conform the respective Indenture to the clear and unambiguous intent of the parties, as expressed in the Offering Circular pursuant to which the Notes were issued.

3.     Each of the requests for execution of the Supplemental Indentures was accompanied, as required by sections 9.06 and 11.04 of each Indenture, by (i) an officers' certificate executed by Capmark's Chief Financial Officer and Executive Vice President ("Officers' Certificate"), certifying that each Supplemental Indenture was authorized under Section 9.01(i) therein, and (ii) an opinion of counsel, issued by outside counsel for Capmark, Simpson Thacher & Bartlett, LLP ("Opinion of Counsel"), to the effect that each Supplemental Indenture was authorized under, and complied with the terms of, each respective Indenture. DBTCA thereafter executed each of the Supplemental Indentures on or about May 20, 2009, in reliance on the Officers' Certificates and Opinions of Counsel provided by Capmark.

4.     On or about October 1, 2009, the above-named Defendants, who purport to hold in the aggregate approximately $800 million in face value of the Notes (the "Noteholder Plaintiffs"), filed an action against DBTCA in the Supreme Court of the State of New York,

County of New York, Case Number 09-603025 (the "Noteholder Action"), asserting claims for breach of contract, violation of the Trust Indenture Act, breach of fiduciary duty and negligence on the part of DBTCA in connection with the issuance of the Supplemental Indentures. On or about November 9, 2009, the Noteholder Plaintiffs served and filed an amended complaint in the Noteholder Action.

5.    On October 16, 2009, DBTCA filed an answer to the original complaint. DBTCA also filed a third-party complaint (the "Third Party Complaint") against the Plaintiff-Debtors, as well as two of their nondebtor affiliates (the "Additional Defendants"),[2] seeking contribution and indemnity for all damages, costs and expenses DBTCA incurs as a result of the claims asserted by the Noteholder Plaintiffs.

6.    By operation of section 362(a)(1) of title 11 of the United States Code (the "Bankruptcy Code"), the Third Party Action against the Plaintiff-Debtors was automatically stayed on October 25, 2009 (the "Commencement Date"), the date on which the Debtors filed their Chapter 11 petitions in this Court.

7.    On November 23, 2009, pursuant to the federal bankruptcy removal statute, 28 U.S.C. §1452(a), and Rule 9027 of the Federal Rules of Bankruptcy Procedure, DBTCA timely removed the Noteholder Action to the United States District Court for the Southern District of New York (the "New York District Court").

8.    This adversary proceeding seeks two forms of relief against the Noteholder Plaintiffs: *first*, a declaration that, pursuant to section 362 of the Bankruptcy Code, the automatic stay applicable to claims against the Debtors precludes the Noteholder Plaintiffs

_____

[2]    The Additional Defendants, Capmark Investments LP and Crystal Ball Holding of Bermuda Limited, are guarantors of Capmark's obligations under the Indentures.

from prosecuting their claims in the Noteholder Action against DBTCA, which, in light of DBTCA's rights of indemnity, are *de facto* claims against the Debtors themselves; and *second*, in the alternative, issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code to preclude the Noteholder Plaintiffs from prosecuting their claims in the Noteholder Action against DBTCA.

9.　　As explained below, the claims in the Noteholder Action are inextricably linked to the Debtors' Chapter 11 cases. Resolution of the claims asserted by the Noteholder Plaintiffs will, among other things, (i) significantly affect the administration of the Debtors' estates, (ii) require discovery of the officers and other key employees of the Debtors, (iii) increase the amount, and interfere with this Court's determination, of DBTCA's contractual claims for indemnity from the Debtors, and (iv) create an undue risk of multiple litigation and inconsistent adjudications. Relief is thus necessary from this Court to ensure that the Debtors are not forced to waive the automatic stay and participate in the Noteholder Action to protect their interests and property of the bankruptcy estates.

## JURISDICTION

10.　　On the Commencement Date, each of the Debtors commenced a case under Chapter 11 of the Bankruptcy Code. By order of this Court dated October 27, 2009, the Debtors' Chapter 11 cases (the "Chapter 11 Cases") have been consolidated for procedural purposes only and are being jointly administered.

11.　　The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.　　This is an adversary proceeding initiated by the Debtors pursuant to Rules 7001(7) (to obtain an injunction or other equitable relief), 7001(9) (to obtain a declaratory

judgment) and 7003 of the Federal Rules of Bankruptcy Procedure. Bankruptcy Rule 7065 provides that a temporary restraining order or preliminary injunction may be issued by the Court without security.

13. Debtors seek declaratory and injunctive relief to protect property of the Debtors as of the commencement of the case and property of the estate. This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334.

14. This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(G) and, accordingly, this Court has the power to enter final findings of fact and conclusions of law, subject to review pursuant to 28 U.S.C. §158.

15. Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409(a).

## THE PARTIES

16. Plaintiff Capmark is a Nevada corporation with its principal place of business at 116 Welsham Road, Horsham, Pennsylvania. Capmark is a debtor and debtor-in-possession in the Chapter 11 Cases.

17. Plaintiff Capmark Capital Inc. is a Colorado corporation with its principal place of business at 1801 California Street, S-3900, Denver, Colorado. Capmark Capital Inc. is a debtor and debtor-in-possession in the Chapter 11 Cases.

18. Plaintiff Capmark Finance, Inc. is a California corporation with its principal place of business at 116 Welsham Road, Horsham, Pennsylvania. Capmark Finance, Inc. is a debtor and debtor-in-possession in the Chapter 11 Cases.

19. Plaintiff Commercial Equity Investments, Inc. is a Pennsylvania corporation with its principal place of business at 116 Welsham Road, Horsham, Pennsylvania.

Commercial Equity Investments, Inc. is a debtor and debtor-in-possession in the Chapter 11 Cases.

20.     Plaintiff Mortgage Investments, LLC is a Delaware limited liability company with its principal place of business at 116 Welsham Road, Horsham, Pennsylvania. Mortgage Investments, LLC is a debtor and debtor-in-possession in the Chapter 11 Cases.

21.     Plaintiff Net Lease Acquisition LLC is a Delaware limited liability company with its principal place of business at 1801 California Street, S-3900, Denver, Colorado. Net Lease Acquisition LLC is a debtor and debtor-in-possession in the Chapter 11 Cases.

22.     Plaintiff SJM CAP, LLC is a Delaware limited liability company with its principal place of business at 116 Welsham Road, Horsham, Pennsylvania. SJM CAP, LLC is a debtor and debtor-in-possession in the Chapter 11 Cases.

23.     Defendant Gruss Global Investors Master Fund, Ltd. is a Cayman Islands exempt company with its principal place of business in New York, New York.

24.     Defendant Gruss Global Investors Master Fund (Enhanced), Ltd. is a Cayman Islands exempt company with its principal place of business in New York, New York.

25.     Defendant Perry Partners International, Inc. is a British Virgin Islands corporation with its principal place of business in the Cayman Islands.

26.     Defendant Perry Partners L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

27.     Defendant TPG Credit Opportunities Fund, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

28.     Defendant TPG Credit Opportunities Investors, L.P. is a Cayman Islands limited partnership with its principal place of business in Minneapolis, Minnesota.

29.     Defendant TPG Credit Strategies Fund, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

30.     Defendant The Varde Fund, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

31.     Defendant The Varde Fund V-B, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

32.     Defendant The Varde Fund VI-A, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

33.     Defendant The Varde Fund VII-B, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

34.     Defendant The Varde Fund VIII, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

35.     Defendant The Varde Fund IX, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

36.     Defendant The Varde Fund IX-A, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

37.     Defendant Varde Investment Partners (Offshore), Ltd. is a Cayman Islands exempt company with its principal place of business in Minneapolis, Minnesota.

38.     Defendant Varde Investment Partners, L.P. is a Delaware limited partnership with its principal place of business in Minneapolis, Minnesota.

39.     Defendant VR Liquidity Crisis Recovery Fund, L.P. is a Cayman Islands limited partnership with its principal place of business in Minneapolis, Minnesota.

40. Defendant VR Global Partners is a Cayman Islands partnership with its principal place of business Moscow, Russia.

41. Defendant York Capital Management, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

42. Defendant York Investment Master Fund, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in the Cayman Islands.

43. Defendant York Select, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

44. Defendant York Credit Opportunities Fund, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

45. Defendant HFR ED Select Fund IV Master Trust is a Bermuda trust with its principal place of business in Bermuda.

46. Defendant Lyxor/York Fund Limited is a Jersey Island company with its principal place of business in Jersey, Channel Islands.

47. Defendant York Select Master Fund, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in the Cayman Islands.

48. Defendant York Global Value Master Fund, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in the Cayman Islands.

49. Defendant Permal York Limited is a British Virgin Islands company with its principal place of business in the British Virgin Islands.

50. Defendant York Credit Opportunities Master Fund, L.P. is a Cayman Islands exempted limited partnership with its principal place of business in the Cayman Islands.

51.     Defendant American Durham LP is a Delaware limited partnership with its principal place of business in New York, New York.

52.     Defendant International Durham Ltd. is a British Virgin Islands exempt company with its principal place of business in New York, New York.

53.     Defendant Aurelius Capital Master Ltd. is a Cayman Islands exempt company with its principal place of business in the Cayman Islands.

54.     Defendant ACP Master, Ltd. is a Cayman Islands exempt company with its principal place of business in the Cayman Islands.

55.     Defendant Third Point, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

## FACTUAL BACKGROUND

56.     The debtors in these jointly administered Chapter 11 Cases and their non-debtor subsidiaries and affiliates are a group of commercial real estate finance companies that provide real estate-related products and services to borrowers, investors and other customers along three core business lines: (i) commercial real estate lending and mortgage banking; (ii) commercial real estate loan servicing; and (iii) investments and funds management.

57.     On or about May 10, 2007, Capmark issued $2,550,000,000 of unsecured Notes, consisting of (i) $850 million (later reduced to $830 million) in Floating Rate Senior Notes Due 2010; (ii) $1.2 billion in 5.875% Senior Notes Due 2012; and (iii) $500 million in 6.300% Senior Notes Due 2017. Each series of Notes was issued pursuant to a separate Indenture. DBTCA served as the Indenture Trustee for each series of Notes. The remaining Plaintiff-Debtors are guarantors of Capmark's obligations as Issuer under the Indentures.

58.     The majority of the proceeds of the Notes was used to repay a portion of the Plaintiff-Debtors' outstanding balance under a $5.25 billion bridge loan (the "Bridge Loan") that was obtained on or about March 23, 2006 in connection with the acquisition of a controlling interest in the Plaintiff-Debtors from an affiliate of GMAC LLC by several private equity sponsors, and the remaining proceeds were used for general corporate purposes.  In addition to the Bridge Loan, the Plaintiff-Debtors were also parties to a $5.5 billion Revolving Credit and Term Loan Agreement dated March 23, 2006 (the "Revolving Credit and Term Loan" and together with the Bridge Loan, the "Senior Credit Facilities") that remained outstanding at the time of the issuance of the Notes.

59.     As is typical in unsecured credit facilities, each of the Senior Credit Facilities contained a limitation on liens covenant (the "Senior Credit Facilities Limitation on Liens Covenants") that restricted the ability of Capmark to incur secured indebtedness.  Under the Senior Credit Facilities Limitation on Liens Covenants in effect at the time the Notes were issued, the Plaintiff-Debtors agreed they would not incur any indebtedness secured by liens on their property or assets unless all obligations owed under the Senior Credit Facilities were secured equally and ratably by the property or assets subject to the lien, with certain exceptions.  One of those exceptions permitted the Plaintiff-Debtors to grant liens securing indebtedness on their property or assets to the extent that such liens would not exceed 20% of the difference between consolidated  shareholders' equity and Attributed Equity (as that term was defined in the Senior Credit Facilities) in the aggregate (the "Senior Lien Basket").  The Senior Credit Facilities thus expressly contemplated and permitted Capmark to issue secured indebtedness up to a certain amount without the prior consent of unsecured creditors or having to secure such lenders' obligations.

60. When negotiating the terms of the Notes, both Capmark and the initial purchasers/underwriters (the "Initial Purchasers") of the Notes were cognizant of the terms of the Senior Credit Facilities and, in particular, the terms of the Senior Lien Basket included in the Senior Credit Facilities Limitation on Liens Covenants. The parties discussed and agreed that the terms of the Notes needed to contain a similar "lien basket," permitting Capmark to issue secured indebtedness in the future up to an agreed limit without prior Noteholder consent and/or having to secure the obligations to Noteholders equally and ratably.

61. At the outset of the negotiations, the Initial Purchasers proposed that Capmark agree to the same "limitation on liens" covenant and lien basket that was contained in the Senior Credit Facilities. Capmark, however, sought to increase the size of the proposed lien basket (and informed the Initial Purchasers that it would be seeking a corresponding modification to the Senior Lien Basket). After considerable negotiation, the parties agreed to a limitation on liens covenant (the "Limitation on Liens Covenant") substantially similar to the Senior Credit Facilities Limitation on Liens Covenants, except for the lien basket (the "Lien Basket"), which the parties agreed to expand so as to allow the Plaintiff-Debtors to grant liens securing indebtedness to the extent that such liens, together with other outstanding indebtedness of the Plaintiff-Debtors secured by liens, would not exceed the greater of (i) 10% of Consolidated Net Tangible Assets (as defined in the Indentures) or (ii) $1.5 billion. That is what the parties, including Capmark and the Initial Purchasers, intended.

62. The documentation relating to the Notes included both an Offering Circular (the "Offering Circular"), drafted by the Issuer's counsel, which was delivered to prospective purchasers of the Notes, and an Indenture, which was drafted by counsel for the Initial

Purchasers. The Offering Circular was the disclosure document under which the Notes were marketed and sold to prospective purchasers.

63. The Offering Circular contained a detailed description of the terms of the Notes and related Indentures. Significantly, page 191 of the Offering Circular contained a detailed description of the Limitations on Liens Covenant and the Lien Basket agreed upon by the Initial Purchasers and Capmark. The description of the Lien Basket reads as follows:

> Notwithstanding the foregoing, the restrictions set forth in this "Limitation on Liens" covenant will not apply to the incurrence of any Liens securing Indebtedness which, together with other outstanding Indebtedness of ours or our Guarantors **secured by Liens** (not including Indebtedness secured by Liens otherwise permitted under the foregoing numbered exceptions) does not exceed the greater of (i) 10% of Consolidated Net Tangible Assets and (ii) $1.5 billion.

(Emphasis added.)

64. Consistent with this provision, on page one of the Offering Circular, Capmark explained that the Notes would "rank equally with all of our existing and future senior unsecured indebtedness and senior to our subordinated indebtedness . . . . *Secured debt incurred by us or a subsidiary guarantor will be effectively senior to the notes and the guarantees to the extent of the value of the assets securing that debt.*" (Emphasis added.) In addition, in the summary of the offering contained in the Offering Circular, Capmark described in greater detail how the Notes would rank in connection with Capmark's current and future indebtedness. More specifically, the Offering Circular (at page 13) noted that:

> Secured debt that we or a subsidiary guarantor may incur in the future and all other secured obligations of Capmark Financial Group Inc. or the subsidiary guarantors in effect from time to time will be effectively senior to the notes and the guarantees to the extent of the value of the assets securing such debt. As of December 31, 2006, Capmark Financial Group Inc. had directly incurred approximately $7.0 billion of outstanding indebtedness, all of which was senior indebtedness and none of which was secured.

13

65.     It is thus clear from the Offering Circular that Capmark contemplated issuing, and had expressly reserved the right to issue in the future, without the consent of Noteholders and/or having to secure its obligation to Noteholders equally and ratably, up to $1.5 billion in secured indebtedness.  This understanding and the parties' intent is further reflected in other public filings, including the July 14, 2008 prospectus (the "2008 Prospectus") used to market the Notes in the secondary market, which contained the identical description of the Lien Basket found in the Offering Circular.  The parties' understanding and intent was also well-understood by the financial market, as evidenced by articles in publications such as Debtwire describing the Notes.

66.     The description of the Lien Basket in Section 4.04 of each Indenture, however, inadvertently omitted the words "secured by Liens" due to a scrivener's error.  As a result, Section 4.04 of each Indenture mistakenly read as follows:

> Notwithstanding the foregoing, this Section 4.04 shall not apply to the incurrence of any Liens securing Indebtedness which, together with other outstanding Indebtedness of ours or our Guarantors (not including Indebtedness secured by Liens otherwise permitted under Section 4.04(a) through 4.04(g) inclusive), does not exceed the greater of (i) 10% of Consolidated Net Tangible Assets and (ii) $1.5 billion.

67.     From a plain reading of Section 4.04, it is obvious that the parties' intent was to afford Capmark the ability in the future to issue secured debt up to the greater of (i) 10% of Consolidated Net Tangible Assets, and (ii) $1.5 billion, without the consent of Noteholders and/or having to secure its obligation to Noteholders equally and ratably.  Any other reading of the clause would have rendered it meaningless.  That is because, at the time the Notes were issued, Capmark already had over $7 billion in unsecured indebtedness outstanding under the Senior Credit Facilities (which on their face expressly permitted Capmark to issue secured debt up to the amount set forth in the Senior Lien Basket).  It

would have made no sense for Capmark to have agreed to include a more restrictive Limitation on Liens Covenant in the Indentures — one that would have caused the Indentures effectively to have no lien basket — thereby eliminating the flexibility Capmark had already negotiated for itself in the Senior Credit Facilities. Yet that is the interpretation of Section 4.04 that is being advanced by the Noteholder Plaintiffs in the Noteholder Action. Indeed, under the Noteholders' strained, and obviously incorrect, interpretation of Section 4.04 of the Indentures, had Capmark previously been utilizing the lien basket available to it under the Senior Credit Facilities, it would have been in immediate default under the Indentures upon the incurring of any liens not existing on the date of the issuance of the Notes or covered by another exception, thereby effectively eliminating the lien basket under the Senior Credit Facilities.

68.     In reliance upon the plain meaning of the words and the intent of the parties as expressed in the Offering Circular, in May 2009, the board of directors of Capmark authorized the company to issue $1.5 billion in secured debt under the Term Loan Facility. It was in this connection that Capmark decided, for the avoidance of doubt, to amend the Indentures to insert the words "secured by Liens" in Section 4.04 that had been inadvertently omitted from the Indentures. Capmark also sought and obtained amendments to the Senior Credit Facilities, dated as of May 29, 2009, that explicitly permitted the incurrence of liens, in addition to any liens permitted under the Senior Lien Basket, in the aggregate principal amount not to exceed $1.5 billion in respect of the Term Loan Facility.[3]

---

[3]     In 2008, Capmark sought to amend the Senior Credit Facilities to increase the size of the Senior Lien Basket to $1.5 billion, consistent with the Lien Basket applicable to the Notes, but, after negotiation, only obtained an amendment to increase the Senior Lien Basket to the greater of $750 million or 20% of consolidated shareholders' equity minus Attributed Equity. Requesting such an
*continued on following page…*

69.     Section 9.01(i) of the Indentures authorizes amendments to be made for the purpose of curing any ambiguity, omission, defect or inconsistency without notice to or consent of any Noteholder.  Accordingly, in May 2009, Capmark prepared the Supplemental Indentures pursuant to Section 9.01(i) of the Indentures to correct the inadvertent omission of the words "secured by Liens" from Section 4.04 of the Indentures, thereby making the Indentures consistent with the description of the Limitation on Liens Covenant set forth on page 191 of the Offering Circular and the intent of the parties.

70.     In connection with the preparation and execution of the Supplemental Indentures, Capmark presented DBTCA, pursuant to Sections 9.06 and 11.04 of each Indenture, with an Officers' Certificate, executed by Capmark's Chief Financial Officer and Executive Vice President, certifying that each Supplemental Indenture was authorized under Section 9.01(i) of the respective Indentures.

71.     Capmark also presented DBTCA, pursuant to Sections 9.06 and 11.04 of the Indentures, with Opinions of Counsel from Simpson Thacher & Bartlett, LLP ("STB"), opining that each Supplemental Indenture was authorized under the respective Indentures and complied with the provisions of such Indentures (including Sections 9.01(i) and 9.03 thereof).

72.     Prior to issuing its Opinions of Counsel (described above), STB, among other things, reviewed the terms of the Senior Credit Facilities, examined the terms and drafting history of the Offering Circulars and the Indentures, and consulted the counsel for the initial

---

*continued from preceding page…*

amendment would have made no sense if Capmark and the senior lenders believed that the Lien Basket relating to the Notes precluded the issuance of any secured indebtedness at the time.

purchasers of the Notes, Shearman & Sterling, LLP ("Shearman"), who confirmed that the words "secured by Liens" had been inadvertently omitted from the Indentures and should have been included in Section 4.04.

73.     Sections 9.06 and 11.04 of each Indenture expressly authorized DBTCA, in executing the Supplemental Indentures, to rely upon the Officers' Certificates and Opinions of Counsel, and further provided that DBTCA shall not be liable for acting in good faith reliance thereon.  Upon presenting DBTCA, pursuant to sections 9.06 and 11.04 of each Indenture, with the requisite Officers' Certificate and Opinion of Counsel, DBTCA, acting in good faith reliance thereon, executed each of the Supplemental Indentures, thereby curing the inadvertent omission of the language "secured by Liens" from Section 4.04 of each Indenture and making the provision consistent with the language in the Offering Circular and the parties' intent.  Notice of the execution of the Supplemental Indentures was promptly provided to all Noteholders, in accordance with and as required by the terms of the Indentures.

74.     After the Supplemental Indentures were executed, and the ambiguity, omission, defect or inconsistency in Section 4.04 of each Indenture had been cured, Capmark proceeded with the issuance of $1.5 billion in secured debt under the Term Loan Facility.  It did so in full compliance with the terms of the Indentures.

75.     On October 1, 2009, the Noteholder Plaintiffs commenced the Noteholder Action in New York State Court against DBTCA, as Indenture Trustee, asserting claims for breach of contract, violation of the Trust Indenture Act, breach of fiduciary duty and negligence in connection with DBTCA's execution of the Supplemental Indentures.  In their complaint, the Noteholder Plaintiffs claim (i) that the amendment effected by the

Supplemental Indentures did not "cure any ambiguity, omission, defect or inconsistency" in the Indentures but rather constituted material changes to the terms of the Notes, which, under Section 9.02 of the Indentures, could not be validly made without notice and prior consent of a majority in principal amount each outstanding series of Notes, and (ii) that the issuance of $1.5 billion in secured debt under the Term Loan Facility constituted a breach of the Limitation on Liens Covenant in each Indenture. The Noteholder Plaintiffs seek unspecified money damages from DBTCA.

76.     On October 16, 2009, DBTCA served and filed an answer to the original complaint in the Noteholder Action, denying any and all liability and wrongdoing, averring, among other things, that in executing the Supplemental Indentures, DBTCA relied in good faith on the Officers' Certificates and Opinions of Counsel supplied by Capmark, and asserting that, as a result, it could not be held liable under the express terms of the Indentures.

77.     Contemporaneous with the filing of its answer, DBTCA served and filed its Third Party Complaint against the Debtors and the Additional Defendants, alleging, among other things, that it was required to execute the Supplemental Indentures and entitled to rely conclusively on the representations made in the Officers' Certificates and Opinions of Counsel in doing so. DBTCA further alleges that, pursuant to Sections 7.07, 9.06 and 10.01 of the Indentures, the Debtors are obligated to indemnify DBTCA for "any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses)," incurred in connection with the Noteholder Action. Alternatively, DBTCA claims that it is entitled to contribution from the Debtors for all amount for which DBTCA may be held liable to the Noteholder Plaintiffs. No response to the Third Party Complaint has yet been served or filed by the Debtors and/or the Additional Defendants.

78. On October 25, 2009, the Debtors commenced the above-captioned Chapter 11 Cases. By operation of Section 362(a)(1) of the Bankruptcy Code, the Third Party Action against the Plaintiff-Debtors was automatically stayed upon the commencement of these Chapter 11 Cases.

79. On or about November 9, 2009, the Noteholder Plaintiffs served and filed an amended complaint in the Noteholder Action. On or about December 4, 2009, DBTCA served and filed its answer to the amended complaint.

80. On November 23, 2009, pursuant to the federal bankruptcy removal statute, 28 U.S.C. §1452(a), and Rule 9027 of the Federal Rules of Bankruptcy Procedure, DBTCA timely removed the Noteholder Action to the United States District Court for the Southern District of New York (the "New York District Court"), under Civil Action No. 1:09-cv-09723-AKH.

81. In its Notice of Removal, DBTCA set forth the grounds for removal, explaining that the issues and claims in the Noteholder Action are inextricably linked to the Debtors' Chapter 11 Cases in that, among other things:

- The determination of the claims in the Noteholder Action will automatically determine the amount of DBTCA's indemnity claims against the Debtors under the Indentures and the effect thereof on the recoveries of the Noteholder Plaintiffs (and other noteholders not party to the Noteholder Action), which are "core" functions of this Court;

- Certain noteholders have threatened litigation in the Chapter 11 Cases challenging the liens of the secured creditors under the Term Loan Facility, the outcome of which could also affect the rights and amounts of any recovery in the Noteholder Action and/or moot the claims therein;

- The amount of DBTCA's indemnity claim against the Plaintiff-Debtors cannot be determined until the effect of the Supplemental Indentures and the damages, if any, that the Noteholder Plaintiffs may have suffered are determined, and such matters can only be determined in "core" proceedings in these Chapter 11 Cases involving the validity and

avoidability of the Term Loan Facility and the intercreditor relationships of the noteholders and the holders of the secured debt;

- Determination of the claims against DBTCA in the Noteholder Action will require extensive, time-consuming and distracting discovery of the Debtors and their directors, officers and employees that will undoubtedly interfere with the administration of these Chapter 11 Cases;[4] and

- The simultaneous litigation of such claims and the Noteholder Action creates a very real risk of potentially inconsistent rulings on identical issues that will be litigated in "core" proceedings in these Chapter 11 Cases.

82.  As is evident from the above, the claims asserted in the Noteholder Action are only part of a complex and interrelated set of critical legal problems that must be resolved by this Court during its oversight of these Chapter 11 Cases.  In the unlikely event DBTCA were held liable for executing the Supplemental Indentures, the amount of any damages suffered by the Noteholder Plaintiffs could not be quantified prior to a resolution by the Bankruptcy Court of the value of any recovery by noteholders under the Debtors' confirmed Chapter 11 plans.  The amount of such recovery will, in turn, depend on this Court's resolution of the matters set forth by DBTCA in its Notice of Removal and at least three other significant issues that will require resolution in the context of these Chapter 11 Cases.  Specifically, these issues are:  (i) Capmark's requirement to properly capitalize Capmark Bank; (ii) the characterization of various intercompany balances; and (iii) the validity of certain savings clauses executed in connection with the Term Loan Facility and the Senior Credit Facilities. All of these interrelated issues are of critical importance in the Debtors' Chapter 11 Cases, and judicial efficiency compels a comprehensive resolution in a single venue — this Court.

---

[4]      Indeed, prior to removal, the Noteholder Plaintiffs had already served broad discovery requests on DBTCA.

## FIRST CLAIM FOR RELIEF

### (For a Declaration that the Automatic Stay of Section 362(a) of the Bankruptcy Code Bars Continued Prosecution of the Noteholder Action against DBTCA)

83.     The Plaintiff-Debtors repeat and reallege each and every allegation contained in the paragraphs 1 through 82 of this Complaint as if set forth in full herein.

84.     Pursuant to Section 362(a) of the Bankruptcy Code, upon the Debtors' filing of their petitions under Chapter 11 of the Bankruptcy Code, any proceedings that were commenced prior to the Commencement Date against them or to recover a claim against them (including without limitation the Third Party Action) were automatically stayed.

85.     Pursuant to Sections 7.07, 9.06 and 10.01 of the Indentures, the Debtors are obligated to indemnify DBTCA for "any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses) incurred by or in connection with . . . the performance of its duties [under the Indentures], including the cost and expenses of . . . defending itself against . . . any claim," provided that such losses, liabilities or expenses are not the result of DBTCA's own willful misconduct, negligence or bad faith.  Thus, the claims in the Noteholder Action against DBTCA are essentially *de facto* claims against the Debtors, and they are also attempts to recover on prepetition claims against the Debtors from DBTCA. The Debtors have a direct interest in the outcome of the Noteholder Action insofar as it seeks a determination of the validity of the amendments to the Indentures described in the Supplemental Indentures, the determination of which could have a significant impact on the claims of various creditor constituencies in the Debtors' Chapter 11 Cases.

86.     As described above, the claims in the Noteholder Action are inextricably linked to the Debtors' Chapter 11 Cases.  Resolution of the claims asserted by the Noteholder Plaintiffs will, among other things, (i) significantly affect the administration of the Debtors'

21

estates, (ii) require discovery of the officers and other key employees of the Debtors, (iii) increase the amount, and interfere with this Court's determination, of DBTCA's contractual claims for indemnity from the Debtors, and (iv) create an undue risk of multiple litigation and inconsistent adjudications. Relief is thus necessary from this Court to ensure that the Debtors are not forced to waive the automatic stay and participate in the Noteholder Action to protect their interests and property of the bankruptcy estates.

87.     Because the Noteholder Action, both directly and indirectly through DBTCA, is "the continuation . . . of a judicial action . . . to recover a claim against the [Debtors] that arose before the commencement of the case," the Debtors are entitled, pursuant to Section 362(a)(1) of the Bankruptcy Code, to a declaration that the automatic stay bars continued prosecution of the Noteholder Action.

## VI.

## SECOND CLAIM FOR RELIEF

## (For Injunctive Relief Pursuant to 11 U.S.C. §105(a) and Bankruptcy Rule 7065)

88.     The Debtors repeat and reallege each and every allegation contained in paragraphs 1 through 87 of this Complaint as if set forth in full herein.

89.     In the bankruptcy context, preliminary injunctions are issued pursuant to (i) section 105(a) of the Bankruptcy Code, pursuant to which Bankruptcy Courts are empowered to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," and (ii) Bankruptcy Rule 7065, pursuant to which the Court may grant a preliminary injunction on application of a debtor in possession without the debtor in possession being required to (a) comply with Rule 65 of the Federal Rules of Civil Procedure or (b) post any security as a condition to the Court's grant of such relief.

90.     In determining whether to issue an injunction expanding the protections of the automatic stay to nondebtor parties, courts generally consider: (i) whether the nondebtor and debtor share an identity of interest such that a suit against the nondebtor is essentially a suit against the debtor, and (ii) whether the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization.

91.     The Debtors meet the applicable standard for injunctive relief.  First, the Debtors have no adequate remedy at law.  Second, the Debtors are able to demonstrate irreparable harm by the continuation of the Noteholder Action.  Due to the Debtors' indemnity obligations and the possible adverse effect on various creditor constituencies that an unfavorable decision in the Noteholder Action may have, any claim by the Noteholder Plaintiffs against DBTCA is essentially a *de facto* claim against the Debtors, who, unless the prosecution of the Noteholder Action is stayed, will need to divert considerable resources from their reorganization efforts to the Noteholder Action, which will likely entail substantial discovery.  Third, the balance of hardship tips decidedly in favor of the Debtors.  The validity of the amendments to the Indentures described in the Supplemental Indentures will undoubtedly need to be litigated and decided in the context of these Chapter 11 Cases, as will any claims for indemnity by DBTCA against the Debtors.  It would be unduly expensive and burdensome for the Debtors to litigate these issues in multiple forums, thereby increasing the risk of inconsistent adjudications that could affect the recovery of other creditor.  The Noteholder Plaintiffs, on the other hand, will suffer no hardship if their claims, which in essence are seeking a larger share of the Debtors' estates than similarly situated creditors (including other noteholders), are adjudicated within the Debtors' Chapter 11 Cases.  Fourth, the Debtors can show a reasonable likelihood of a successful reorganization, since there

remains ample time for the submission of a reorganization plan and the Debtors have already taken affirmative steps to optimally allocate their assets.

92. By staying the prosecution of the Noteholder Action, injunctive relief in this case aligns squarely with the central goals of the Bankruptcy Code. If given the breathing space afforded by injunctive relief, the Debtors will have the opportunity to present all of the interrelated claims of creditors impacted by the Supplemental Indentures and the Noteholder Action to this Court for an efficient resolution, together with all the other issues that must be resolved in due course.

**WHEREFORE** the Debtors demand judgment as follows:

(1) on the First Claim For Relief, a declaration that the automatic stay bars continued prosecution of the Noteholder Action pursuant to 11 U.S.C. §362(a).

(2) on the Second Claim For Relief, preliminary and permanent injunctive relief, pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065, barring the continued prosecution of the Noteholder Action; and

(3) such other relief as the Court deems appropriate.

Dated: January 5, 2010

_____
Frederick B. Rosner (No. 3995)
Scott J. Leonhardt (No. 4885)
MESSANA ROSNER & STERN LLP
1000 N. West Street
Suite 1200
Wilmington, Delaware 19801
Telephone: 302.777.1111

-and

Martin J. Bienenstock
Michael P. Kessler
Judy G.Z. Liu
Richard W. Reinthaler
Arielle Kane
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212.259.8000

*Attorneys for the Plaintiff-Debtors*